UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                         PLAINTIFF

v.                                             CRIMINAL ACTION NO. 3:11-MJ-218-DW

LEO PARRINO                                                      DEFENDANT

**MEMORANDUM OPINION
AND ORDER**

**INTRODUCTION**

This matter comes before the Magistrate Judge on the motion of the Defendant, Leo

Parrino, who seeks to vacate, set aside or correct a judgment of conviction entered against him in

this Court on May 5, 2013, following his plea of guilty to a misdemeanor charge involving the

introduction and delivery for introduction into interstate commerce of misbranded inhalation

drugs.[1]

Parrino now maintains that his guilty plea was unknowing and involuntary due to the

inadequate legal advice of his retained counsel, attorney Kenneth Plotnik, who allegedly failed to

advise Parrino that as a result of his misdemeanor guilty plea Parrino would be subject to five

years of mandatory exclusion from all federal healthcare programs such as Medicare and

Medicaid.[2]  Because Parrino is a pharmacist, his exclusion by the Office of Inspector General

(OIG) of the Dept. of Health and Human Services deprived him of his sole livelihood, a civil

penalty that he maintains was far and away more severe than his sentence of conviction, which

was merely a year of probation along with restitution in the amount of $14,098.24.

Parrino argues that *Padilla v. Kentucky*, 559 U.S. 356 (2010) imposed a constitutional

duty upon attorney Plotnik to adequately advise him of this dire possibility of mandatory

---

[1]  *See,* 21 U.S.C. §§331(a), 333(a)(1) and 352(a).
[2]  *See* 42 U.S.C. §1320a-7(a)(1).

exclusion so that he could intelligently decide whether to accept the plea offer of the Government.  He asserts that had he known of the §1320a-7(a)(1) exclusion he would not have chosen to plead guilty, but rather would have proceeded to trial even in the face of possible felony charges and potential restitution order of over $2 million.

## FINDINGS OF FACT

Evidence involving Parrino's Sixth Amendment claim of ineffective assistance of counsel was taken on April 14, 2015, at a suppression hearing held before the Magistrate Judge.[3]  At the hearing, Parrino testified that for over 40 years, since 1974, he has worked as a pharmacist. Parrino holds a pharmacy license in Indiana, Kentucky, Michigan and Arizona.[4]  Beginning in April of 2002, he went to work for National Respiratory Services (NRS) a compounding pharmacy.[5]  Parrino worked at NRS as a pharmacist for four years until October of 2006.[6] During this time, he was the only pharmacist employed by NRS.  His job at the company involved compounding respiratory medications.[7]

On Nov. 1, 2006, Parrino left NRS to take employment with the K-Mart Corporation where he worked as a pharmacist for over seven years earning approximately $120,000 per year.[8]  Parrino continued working at K-Mart until January of 2014, when the mandatory

---

[3]  The hearing was steno graphically recorded by court report Dena Legg.
[4]  DN 78, Transcript of Evidentiary Hearing (Tr.)  6-7.
[5]  Id.  A compounding pharmacy is one in which a licensed pharmacist or physician combines, mixes or alters ingredients of a drug to create a medication tailored to the need of an individual patient.  See http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation /pharmacycompounding/ucm339764 (last visited April 27, 2015).
[6] DN 78, Tr. 8.
[7]  Id.
[8]  Id.

exclusion imposed by the OIG took effect, at which time K-Mart terminated him after a brief period of leave.[9]

Parrino had been working at K-Mart for approximately 2 ½ years when on Feb. 9, 2009 he was contacted by federal agents of the FBI and the FDA.[10]  FDA Agent Mark Bartley and Special Agent Milton of the FBI arranged to meet with Parrino.[11]  Special Agent Bartley had earlier been contacted in August of 2008, by Kathleen Culver, an investigator with the Food and Drug Administration for some 23 years.[12]  Culver had performed an audit of NRS in May of 2008.[13]  Her audit revealed that NRS had been compounding a drug, Budesonide, used in respiratory inhalers and marketed under the name, Pulmicort.  Company records showed that the Budesonide compounded at NRS in 2005 had been tested on various occasions and shown to be less than fully potent, or "subpotent.[14]"  On other occasions, records of test results had shown the Budesonide in the tested inhalers was above the labeled potency, or "superpotent."

Concerned with the results of her audit, investigator Culver contacted FDA Agent Bartley to advise him what she had discovered at NRS and to obtain contact information for the OIG.[15]  Bartley spoke with Culver several times about the subpotent and superpotent Budesonide compounded at NRS.[16]  Culver believed that the mislabeled Budesonide had been shipped in interstate commerce by NRS within a 17-18 state area and that it had been billed to Medicare.[17]  Armed with this information from Culver, Agent Bartley and FBI Special Agent Milton set out to contact Parrino to discuss NRS.  Specifically, Milton and Bartley wanted to know if Parrino,

---

[9] Id.
[10] DN 78, Tr. 9
[11] Id., Tr. 143.
[12] Id., Tr. 142-43.
[13] Id., Tr. 174-175.
[14] Id.
[15] DN 78, Tr. 142.
[16] Id.
[17] Id., Tr. 143.

the pharmacist at NRS, had known that subpotent and superpotent Budesonide had been shipped to patients during his employment with the company.[18]

Parrino explained that on the first occasion that he was visited by the two agents, their questions had focused primarily on the day-to-day operations of NRS.[19]  Parrino explained to them that he was not a member of management at the company.[20]  He had no decision making authority at NRS. He did not own any interest in the company.  He likewise had nothing to do with the billing operations at NRS either.[21]  Parrino tried to answer all of the agents' questions. According to him, he was never told by either Bartley or Milton that he was the target of a federal investigation.[22]  The agents merely thanked him for his cooperation that afternoon and left.

Agent Bartley recalled that Parrino was specifically asked at this first meeting if either subpotent or superpotent drugs had been shipped from NRS.[23]  According to Bartley, Parrino denied that any subpotent or superpotent drugs had left the facility.  Instead, Parrino allegedly told Bartley that any such mislabeled drugs were destroyed.[24]

In August of 2009, the agents again met with Parrino.[25]  On this occasion, they had drug laboratory testing reports obtained from Analytical Research Laboratory (ARL), the Oklahoma testing laboratory routinely used by NRS to test the drugs that NRS compounded, including Budesonide.[26]  Postal inspector Paul King and Agent Bartley during this second meeting revealed laboratory test results that confirmed that various samples of Budesonide had tested

---

[18] DN 78, Tr. 144.
[19] Id., Tr. 9.
[20] Id., Tr. 10.
[21] Id.
[22] Id.
[23] DN 78, Tr. 143-44.
[24] Id.
[25] Id., Tr. 144-45.
[26] Id.

either subpotent or superpotent.[27]  Before he saw the ARL lab reports, Parrino allegedly denied that he knew that any subpotent Budesonide had been shipped out by NRS.[28]

After Parrino viewed the ARL lab reports, he changed his story according to Agent Bartley.  Parrino stated to the agents that a small amount of subpotent drugs had been shipped from NRS.[29]  Parrino told the agents that he was aware of a limited shipment of subpotent drugs and that he had informed NRS Chief Operating Officer Johnny Perry about the problem.[30]  Perry supposedly responded to Parrino that because time was of the essence and drug testing expensive, the small shipment of the subpotent drugs would not be a problem.[31]  Agent Bartley later obtained the shipping records to confirm that subpotent drugs indeed had been shipped out of the NRS facility at the time that Parrino was its sole pharmacist.[32]  At the end of the second interview, the agents had Parrino prepare a handwritten statement, Government Exhibit No. 1, that indicated Parrino was aware that subpotent medications had been shipped out of NRS during his employment.[33]  Parrino also admitted to the agents that on this second occasion he had adjusted the formula for Budesonide on an "as needed" basis.[34]

Parrino acknowledged that he did prepare and sign a written statement at the end of this second meeting with Bartley and the postal inspector.[35]  The statement acknowledges that he was aware of a small amount of the drug that was not the proper strength was sent out to patients.[36]  Parrino, however, was not responsible at NRS to determine the accuracy of the ARL drug test results for Budesonide, a drug that is in suspension and, according to Parrino, must be well

---

[27] Id., p. 145.
[28] Id.
[29] Id.
[30] Id.
[31] Id.
[32] DN 78, Tr. 146.
[33] Id., Tr. 147.
[34] Id., Tr. 148.
[35] Id., Tr. 13.
[36] Id.

5

shaken prior to testing due to its stability problems.[37]  Accordingly, Parrino had no way of knowing if the tested Budesonide had been properly shaken prior to being chemically analyzed at ARL, if the lot sample submitted was beyond its expiration date, or of the testing equipment accuracy or the training of the employees at ARL.  As before, the agents never advised Parrino throughout the second interview that he was the target of the investigation, which he believed was focused on the owner and CEO of NRS.[38]

Matters changed dramatically in May of 2010 for Parrino.  In early May, the office of Assistant United States Attorney Lattrecia Jefferson-Webb contacted Parrino to advise him that the prosecutor wished to meet with him and his attorney.[39]  Prior to this contact, Parrino had no idea that he might be charged with a criminal offense for his involvement in matters at NRS prior to his departure in October of 2006.  Upon being contacted by Webb's office Parrino contacted the only local attorney that he knew, Kenneth Plotnik.[40]

Plotnik had handled some civil matters for Parrino.[41]  He agreed to accompany Parrino to the meeting with Jefferson-Webb on May 27, 2010.[42]  Plotnik had been licensed to practice law in Kentucky since 1978, and had previously worked as a full-time public defender in state court as well as appointed counsel on criminal cases in federal court.[43]  At the meeting, Jefferson-Webb and Agent Bartley laid out the situation for Parrino and Plotnik.  The federal government intended to prosecute Johnny Perry of NRS for Medicare fraud and wanted Parrino's assistance in obtaining a conviction.[44]  The Government believed that Parrino had knowingly compounded and shipped misbranded drugs.  If Parrino agreed to cooperate fully with the Government, the

---

[37] DN 78, Tr.  13-14.
[38] Id., Tr. 14.
[39] Id., Tr. 18.
[40] Id., Tr. 19.
[41] Id., Tr. 18, 81.
[42] Id., Tr. 21.
[43] DN 78, Tr. 79-80.
[44] Id. , Tr. 81.

prosecutor explained that Parrino would be charged with a misdemeanor offense and thereby would avoid a potential felony conviction.[45]

Agent Bartley and the other agent present set out the Government's intended proof.[46] This proof included the ARL lab reports showing subpotent Budesonide test results and Parrino's own handwritten statement, both of which led the agents to openly conclude that they had a strong case against Parrino.[47]  If Parrino did not cooperate he would be potentially subject to not only a federal felony conviction, but also a potential amount of restitution of more than $2 million.[48]  If he did fully cooperate, he would be able to plead guilty to the misdemeanor offense and to substantially reduce any restitution amount.[49]

According to Parrino, he had little or no direct contact from the Government during the following year until August of 2011, when he was formally charged by information with violation of 21 U.S.C. §§331(a), 333(a)(1), 352(a) and 18 U.S.C. §2.[50]  During this hiatus, Parrino called attorney Plotnik several times to ask if he had heard anything from the United States since their Memorial Day meeting with Ms. Jefferson-Webb a year earlier.[51]  Parrino insists that attorney Plotnik throughout their interaction never made mention of any possible defenses to the charged misbranding offenses that he and Linda Schmidt, his replacement pharmacist at NRS, now faced.[52]

Parrino maintains that Plotnik never discussed the elements of the charges either.[53] Instead, in July or August of 2011, Plotnik contacted Parrino to advise him about the

---

[45] DN. 78, Tr. 82.
[46] Id.
[47] Id.
[48] Id.
[49] Id., Tr. 83.
[50] Id., Tr. 20.
[51] Id.
[52] Id., Tr. 22.
[53] Id.

developments with the plea deal.[54]  Under the deal, Parrino would agree to plead guilty to a strict

liability misdemeanor.  In return, he would receive a year of probation, along with a $1,000 fine

and an order of restitution in an amount to be determined.[55]  Armed only with this information,

Parrino elected to enter a plea of guilty before now retired Magistrate Judge Moyer on Sept.8,

2011.[56]

Parrino testified that attorney Plotnik never advised him that a misdemeanor conviction

could require his mandatory exclusion from participation in all federal health programs.[57]  No

one, according to Parrino, ever discussed this possibility with him before his acceptance of the

plea deal.[58]  After Parrino pled guilty, matters once again returned to normal until May of 2013,

when Parrino received a notice of his possible exclusion from the OIG advising him that he may

be suspended from all participation in Medicare or Medicaid billing for five years.[59]

When Parrino received this letter from the OIG he immediately faxed a copy of it to

attorney Plotnik and talked with Plotnik about the proper approach to take to preserve his ability

to function as a pharmacist.[60]  Plotnik, as Parrino recalls, advised Parrino that he disagreed that

exclusion was mandatory under 42 U.S.C. §1320a-7(a)(1) given the language of subsection 7(b)

of the same statute.[61]  Attorney Plotnik wrote to the OIG to express this view - - that exclusion

was not mandatory, but rather permissive and should not be imposed in Parrino's case given his

lack of involvement in the management of NRS.[62]  Once Plotnik sent the response to the OIG,

Parrino believed that the matter had been put to rest since he had not committed fraud, but rather

---

[54] Id., Tr. 23.
[55] Id.
[56] Id.
[57] DN. 78, Tr. 24.
[58] Id.
[59] Id., Tr. 24-25.
[60] Id., Tr. 25.
[61] Id.
[62] Id., Tr. 26.

was convicted of a strict liability misdemeanor that did not require any knowing violation of the charged offenses.[63]

Subsequently, in December of 2013, Parrino again talked with attorney Plotnik who on that occasion advised Parrino that his co-defendant, pharmacist Linda Schmidt, had not been excluded from participation in federal health programs despite her own guilty plea to similar charges.[64]  Nevertheless, on Jan. 2, 2014, Parrino received a second letter from the OIG dated Dec. 31, 2013, that advised him that mandatory exclusion would be imposed upon him pursuant to 42 U.S.C. §1320a-7(a)(1).[65]  Parrino immediately contacted Plotnik to demand that he do something so that Parrino, who was then 67 years old, and had no other occupation, could continue to work as a pharmacist.[66]

Twenty days following his receipt of the second OIG letter, Parrino was excluded from participation.[67]  Attorney Plotnik administratively appealed the exclusion decision without success.[68]  Parrino then retained his current counsel to bring a civil suit against the Department of Health and Human Services.[69]  While these events were occurring in 2014, Parrino also learned that the Kentucky Board of Pharmacy was considering the possible restriction or suspension of his pharmacy license in Kentucky.[70]  Parrino had been led to believe by attorney Plotnik that, based on Plotnik's prior communications with the head of the Pharmacy Board, Mike Burleson, Parinno's alleged misconduct at NRS would be considered to be at worst a "misfill," which would result in only a $500 fine and a requirement for continuing

---

[63] Id.
[64] Id., Tr. 26-27.
[65] DN 68, Response to Motion to Vacate, Exh. 3, OIG Letter of Exclusion; DN 78, Tr. 27.
[66] DN 78, Tr. 27-28.
[67] Id.
[68] DN 68, Exh.4 Attorney Plotnik's Letter of June 18, 2013/ DN 78, Tr. 29-30.
[69] *Parrino v. Kathleen Sebelius, et. al.,* 3:14-CV-48 H.
[70] DN 78, Tr. 30-31.

pharmaceutical education.[71]  Now Parrino also faces the possibility that his Kentucky license

will be compromised, as well.

During his hearing testimony, Parrino reiterated that he received no legal advice about the

possibility of mandatory exclusion based on his misdemeanor plea.  He received no advice

following his plea about the impact of such exclusion.[72]  According to Parrino, attorney Plotnik

never discussed with him the Government's burden of proof or possible defenses to the charges

prior to his entry of a plea of guilty that September of 2011.  Parrino repeated that he would

never have entered a plea of guilty to the misdemeanor, but rather would have insisted on facing

the possibility of a felony prosecution, along with a $2 million order of restitution, had he known

prior to entry of his guilty plea that he would face mandatory exclusion for five years as a result

of his plea.[73]

Attorney Plotnik testified to a different recollection of what occurred after the two men

met with the federal prosecutor on May 27, 2010.  Plotnik recalled that Jefferson-Webb

explained at the meeting that if Parrino cooperated he would be permitted to plead guilty to a

misdemeanor to avoid felony prosecution so long as he agreed to testify against Johnny Perry.[74]

Plotnik recalled that the agents produced the ARL lab reports and the written statement that

Parrino made at the conclusion of the second interview.[75]  The agents advised Parrino and

Plotnik that the Government had a strong case against him that included the possibility of not

only a federal felony prosecution, but also exposure to a $2 million fine if he did not agree to

cooperate and plead guilty to the misdemeanor offense.[76]

---

[71] Id, Tr. 31, 88.
[72] Id., Tr. 32.
[73] DN 78, Tr. 30-31.
[74] Id., Tr. 81-82.
[75] Id., Tr. 82.
[76] Id.

Plotnik testified that after the May 27, 2010 meeting with Jefferson-Webb he discussed with Parrino the possibility that Parrino might be excluded from continuing his profession as a pharmacist.[77]  Parrino, according to Plotnik, knew that there was a statute out there that could result in his expulsion if he was convicted of Medicare fraud.[78]  Plotnik went over the Kentucky statutes on possible exclusion with Parrino,[79] who asked Plotnik to contact the Kentucky Board of Pharmacy to determine the possible consequences if Parrino pled guilty to the misdemeanor offense.[80]  While the federal exclusion statute was an aside at that point, Plotnik insisted that Parrino was aware of it and that the two men had discussed the potential collateral consequences of a guilty plea.[81]

After the May 27 meeting, which was preceded by extensive telephone exchange between attorney Plotnik and Parrino on May 11, the two men had a follow-up meeting the next day and still another one on June 10 to review a letter from Jefferson-Webb sent to Plotnik after their May 27 meeting.[82]  This initial June meeting was followed by a telephonic conference in mid-June.  Plotnik explained that at the time he was concerned with the issue of the constitutionality of the strict liability misdemeanors.[83]  He also went over Parrino's written statement to the agents and Parrino's concerns about the Budesonide not remaining in suspension at the time it was tested.[84]

Plotnik insisted that he discussed potential defenses with Parrino.  By mid-June of 2010 Plotnik had obtained a copy of the federal mandatory exclusions statute, which contains both a

---

[77] DN 78, Tr. 84.
[78] Id.
[79] Id.
[80] Id., Tr. 85.
[81] Id.
[82] Id., Tr. 86-87.
[83] Id., Tr. 89.
[84] Id., Tr. 87-88.

mandatory and a permission section.[85]  Plotnik's belief at the time was that a guilty plea to a

strict liability misdemeanor that had no criminal intent element would put Parrino into the

permissive exclusion category of 42 U.S.C. §1320a-7(b).[86]  Plotnik explained this belief to

Parrino at their mid-June meeting in 2010.  As Plotnik recalled, he told Parrino that it was

possible that he would lose his pharmacy license, although Plotnik did not believe it would be

likely.[87]  According to Plotnik, Parrino was adamant that he would not go to trial on the felony

charge and face the possibility of a $2.4 million restitution obligation as well as a felony

conviction.[88]

Attorney Plotnik contacted attorney Keith Kamenish, counsel for co-defendant, Linda

Schmidt, who advised Plotnik that the ARL drug test results were kept at NRS in a loose-leaf

binder that was available to everyone, contrary to Parrino's version of events-- that the test

results were not ordinarily available to him.[89]  If Parrino were aware of the subpotent test results,

Plotnik concluded that Parrino potentially was subject to a successful prosecution for a felony

offense.[90]

Throughout this time, Plotnik maintains that Parrino was essentially "a basket case" who

was insistent that he did not wish to proceed to trial, so much so that Parrino expressly declined

to discuss potential felony defenses according to Plotnik.[91]  Nevertheless, Plotnik did attempt to

discuss the possible constitutional challenge to the misdemeanor statute, as well as the nature of

the charges and potential defenses, with Parrino.[92]  It was Plotnik's belief that because Parrino

was not in the management of NRS, but rather was a mere "front line" employee that this

---

[85] DN 78, Tr. 89-90.
[86] Id.
[87] Id., Tr. 90.
[88] Id.
[89] DN 78, Tr. 91.
[90] Id.
[91] Id., Tr. 93.
[92] Id., Tr. 92-93.

material factual distinction would limit the possibility of exclusion, as well as, set up the circumstances to minimize Parrino's responsibility for the shipment of the subpotent Budesonide.[93]

When Plotnik did contact Mike Burleson at the Kentucky Board of Pharmacy, Burleson immediately appeared to Plotnik to have substantial knowledge about the facts of Parrino's situation.[94]  This familiarity with the case led attorney Plotnik to believe that Burleson had been contacted by the federal agents, who had related the circumstances of their investigation to him. Yet, Burleson in discussing the matter with Plotnik minimized the possible consequences of the situation, telling Plotnik that a suspension of Parrino's license would not result, but rather merely a fine and some continuing education requirements.[95]

Plotnik was very skeptical of this statement and believed that Burleson was intentionally underplaying the situation.[96]  Indeed, Plotnik suspected that Burleson would be a witness at trial against Parrino if Parrino insisted upon proceeding to trial.[97]  Given Parrino's extreme unwillingness to consider the possibility of a felony trial or to discuss potential defenses to felony charges, it was clear to Plotnik that Parrino simply wanted to get the matter over as quickly as possible and avoid a potentially devastating $2.4 million restitution order.[98]

Plotnik recalled that Parrino signed the plea agreement to enter the misdemeanor guilty plea on July 29, 2011.[99]  Prior to doing so, Parrino met with Plotnik and the two men had a "big discussion" about the plea agreement.[100]  Plea negotiations had begun between Plotnik and Jefferson-Webb in October of 2010.  Plotnik testified that he worked on the language of the plea

---

[93] Id.
[94] Id., Tr. 92.
[95] Id., Tr. 92, 112-13.
[96] Id.
[97] Id., Tr. 93.
[98] DN 78, Tr. 93-94.
[99] Id., Tr. 94.
[100] Id.

agreement a lot over the next six months.[101]  The first draft of the plea agreement included joint and severable liability provision for $2.4 million restitution, which Parrino was very concerned about.[102]  Plotnik had that language removed from the plea agreement.  He also persuaded the Government to include in the plea agreement the words "strict liability" before "misdemeanor" in an effort to minimize Parrino's culpability.

All totaled, Plotnik estimated that he worked on revising the plea agreement for approximately six months.  Plotnik also was able to have removed from the plea agreement language that alleged that nonsterile drugs, as well as subpotent and superpotent drugs, had been introduced into interstate commerce at NRS.[103]  At the time that Parrino signed the plea agreement on July 29, 2011, Plotnik was surprised by Parrino's reaction to the situation.  It appeared to Plotnik that Parrino acted as if he had never previously heard that he possibly could be charged with a felony.  Plotnik considered this reaction to be "very strange."[104]  According to Plotnik, Parrino was highly motivated to get out from under the $2.4 million restitution and was adamant that he did not want to proceed to trial on a felony charge.[105]

On cross-examination, Plotnik testified that he had advised Parrino that if the Government were to prosecute him for fraud it would have to show criminal intent as a mental state.[106]  Plotnik maintains that he discussed the mental state required to be proven for a felony conviction and had researched the statute.[107]  Plotnik recalled that he spent considerable time trying to minimize Parrino's involvement in the criminal conduct to limit any potential collateral

---

[101] Dn. 78, Tr. 94-95.
[102] Id. Tr. 95.
[103] Id., Tr. 97-98.
[104] Id. Tr. 96-97.
[105] Id.
[106] Id., Tr. 106-07.
[107] Id., Tr. 108-09.

consequences such as those before the Kentucky Board of Pharmacy.[108]   Because Parrino was in such a highly emotional state, however, he did not want to discuss potential defenses with Plotnik.[109]   Plotnik recalled that he did discuss the discovery materials provided by the Government extensively with Parrino.[110]   Plotnik also objected to the presentence investigation report prior to sentencing.[111]

As for the possibility of exclusion, Plotnik insisted that he discussed the federal exclusion statute, 42 U.S.C. § 1320a-7, with Parrino, both its mandatory and its permissive subsections.[112] Plotnik, as noted, believed that the permissive subsection of the statute would apply to Parrino.[113]   He acknowledged, however, that he never told Parrino that he would be subject to mandatory exclusion under 42 U.S.C. §1320a-7(a)(1).[114]   On the other hand, Plotnik did not guarantee that Parrino would not be excluded under the statute, either.[115]

Plotnik recalled that he did advise Parrino that the ARL lab test results and NRS shipping records that established that subpotent Budesonide was mailed out to patients while Parrino worked for NRS would be sufficient to convict him on the misdemeanor charges.[116]   Plotnik also was aware that Parrino, on occasion, had added more active ingredient to the Budesonide compound, as well, although Parrino made no effort to reformulate the compound itself.[117]

Throughout the entire process, Parrino's primary concern according to Plotnik was the $2.4 million potential restitution payment.[118]   Defendant Parrino had limited financial assets and

---

[108] DN 78, Tr. 109-110.
[109] Id., Tr. 111.
[110] Id.
[111] Id., Tr. 116.
[112] Id., Tr. 117-118.
[113] Id. Tr. 118.
[114] Id. Tr. 120-21.
[115] Id.
[116] Id., Tr. 122.
[117] Id. Tr. 122-23.
[118] Dn. 78, Tr. 127-28.

NRS was near bankruptcy at the time.[119]  Plotnik therefor worked to reduce the potential amount of restitution payable by Parrino, and was able to successfully lower that amount to approximately $14,000, which Parrino paid in its entirety following his conviction in an effort to further help limit possible collateral damages.[120]

Plotnik remained hopeful during this time that Parrino's case would fall into the permissive exclusion provisions of subsection (b) of 42 U.S.C. §1320a-7, and in fact, at the outset co-defendant Schmidt was placed in this permissive exclusion category, a decision that the OIG later reversed.[121]  Plotnik estimated that in total he spent between 20 and 30 hours of time consulting with Parrino over the course of the entire prosecution process.[122]

The approach that the two men took to the situation was to play a delaying game. Parrino was then in his mid-60s and might not have to bear any significant economic consequences if they could sufficiently delay the imposition of the guilty plea.[123]  Essentially, it was an effort to "run out the clock" according to Plotnik.  Parrino's focus during this time, as Plotnik recalled, was to get the very best plea deal possible and to postpone the day that any adverse action would be taken against him by the Kentucky Board of Pharmacy.[124]  Plotnik recalled that Parino was extremely distraught during this time and was adamant that he would not go to trial.[125]

Plotnik re-emphasized during the hearing that he had discussed the exclusion statute with Parrino, its mandatory and permissive sections, and expressed his opinion that the permissive section would be applied, although Parrino could still possibly be excluded under the statute.[126] Plotnik continues to believe, given the nature of the misdemeanor plea and Parrino's very limited

---

[119]  Id., Tr. 128.
[120]  Id., Tr. 129.
[121]  Id., Tr. 130-32.
[122]  Id., Tr. 135.
[123]  Id., Tr. 136.
[124]  Id., Tr. 137-38.
[125]  Id.
[126]  DN 78, Tr. 139.

involvement in the daily operations of NRS management, that Parrino was inappropriately excluded by the OIG under the mandatory provisions of 42 U.S.C. §1320(a).  In his own words, Plotnik feels Parrino was "cheated" by a "bad statute."[127]

## CONCLUSIONS OF LAW

Our task in the present case is not to consider whether 42 U.S.C. §1320a-7 is a "good" or a "bad" statute; nor do we address whether the OIG acted appropriately in applying it to Parrino. Our focus instead is whether Parrino's Sixth Amendment rights to effective assistance of counsel were violated in connection with the entry of his guilty plea.  More specifically, we ask whether *Padilla* can be expanded to impose a Sixth Amendment duty upon counsel to advise a client of the adverse civil consequences of an otherwise apparently favorable guilty plea prior to acceptance of the plea.  We also must factually determine in the context of this specific issue whether attorney Plotnik did advise Parrino of the 5-year exclusion provisions of 42 U.S.C. §1320a-7.

If *Padilla* cannot be read to impose such a duty on counsel, or alternatively, if Parrino's counsel adequately advised him of the potential for mandatory exclusion under §1320a-7, then Parrino's Sixth Amendment claim obviously will fall short.  On the other hand, if *Padilla* does support such a duty and attorney Plotnik did not advise Parrino of the existence of §1320a-7, or did not adequately advise him of the most likely application of the statute to Parrino's case, then we will be required to consider whether any prejudice resulted, for only if Parrino can show that an objectively reasonable defendant would have insisted upon proceeding to trial had he known of the provisions of 42 U.S.C. §1320a-7 will the prejudice prong of the test for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 686 (1984) be met.

---

[127]  Id. Tr. 139.

Parrino's primary argument is that his plea of guilty was not knowing, intelligent and voluntary because it was the result of gross legal misadvice rising to the level of ineffective assistance of counsel.  In *McMann v. Richardson*, 397 U.S. 759, 771 (1970), the Supreme Court set out the general principle that all "defendants facing felony charges are entitled to the effective assistance of competent counsel."  Subsequently, in *Strickland v. Washington*, 466 U.S. 668, 686 (1984), the Supreme Court established the often-cited benchmark test for evaluating a claim of ineffective assistance of counsel.  *Id*.  Strickland created a two-part test for evaluating claims of ineffective assistance.  First, the defendant must show that the performance of his or her attorney was deficient.  An attorney's performance will be deficient if "counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  *See, Lyons v. Jackson,* 299 F.3d 588, 596 (6th Cir. 2002)(discussing the *Strickland* standard in the context of *Hill v. Lockhart,* 474 U.S. 52 (1985)), *cert. denied,* 537 U.S. 1179 (2003).

The second part of the two-part test of Strickland requires that the defendant establish that the deficient performance of his or her attorney prejudiced the defense.  Id.  When a claim of ineffective assistance is raised in the context of trial, this second part of the Strickland test requires the Petitioner to show that "a reasonable probability existed that but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability in that context is defined by Strickland to be a probability sufficient to undermine the confidence of the court in the outcome of the proceedings.  *Id*.  In the words of Strickland, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.

In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Supreme Court first applied the Strickland standard for ineffective assistance of counsel in the separate context of a guilty plea proceeding. *Hill* reaffirmed the fundamental two-part Strickland test that (1) the performance of counsel must fall below an objective standard of reasonableness, and (2) the defendant was prejudiced thereby so that a reasonable probability existed that but for his attorney's unprofessional errors, the result of the judicial proceeding would have been different. *Hill*, 474 U.S. at 56-60. *Hill*, however, modified the second part of the test, or the "prejudice prong" as it is sometimes known, to require that the defendant show in the context of a guilty plea a reasonable probability that, but for the errors of his counsel, he or she would not have chosen to plead guilty, but rather would have insisted on going to trial. *Id.* at 59. *See gen. Spikes v. Mackie,* 541 Fed. Appx. 637, 649 (6th Cir. 2013)(discussing *Hill* ).

*Hill* explained that the prejudice inquiry in many guilty plea cases, particularly those where the defendant maintained that his attorney failed to advise him of a potential defense, would analytically be similar to those situations wherein courts reviewed claims of ineffective assistance of counsel at trial. In the words of the Court, "the determination whether the error prejudiced" the defendant by causing him to plead guilty rather go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.

This assessment will depend largely on a prediction of whether the evidence likely would have changed the outcome of a trial." *Id.* *See Dando v. Yukins*, 461 F.3d 791,. 798-99 (6th Cir. 2006) ("The Supreme Court added that an assessment of prejudice must include a prediction of the likely outcome at trial."); *Maples v. Stegall*, 340 F.3d 433, 439-40 (6th Cir. 2003) (adopting

an interpretation of Hill that requires the court to analyze the substance of the petitioner's underlying claim to determine prejudice by whether the petitioner would have succeeded at trial).

A defendant's subjective assertion that he or she would have insisted upon proceeding to trial but for the deficient performance of counsel is not controlling where an objectively reasonable defendant would not have insisted upon a trial given the weight of incriminating evidence, the severity of the potential penalties upon conviction and the extent to which the terms of the guilty plea as accepted avoided such severe penalties.

The following Sixth Circuit cases illustrate the objective nature of the prejudice analysis of S*trickland*.  *See Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012)(defendant's subjective assertion that she would have insisted upon proceeding to trial was not objectively reasonable where overwhelming evidence of her guilt of sending threatening letters was established by video surveillance footage, and she faced the prospect of five years in prison if convicted, as opposed to the 6 months and $66,000 fine imposed pursuant to her plea bargain so that she was not prejudiced by the failure of her counsel to mention the possibility of her deportation despite her claim to the contrary); *Haddad v. United States*, 2012 WL 2478355 at *5 (6th Cir. June 28, 2012)(the test for prejudice is an objective one and a defendant cannot establish prejudice under *Strickland* merely by claiming that he would have insisted on proceeding to trial irrespective of the chances of success at trial); *United States v. Chan Ho Shin*, 891 F.Supp.2d 849 (N.D. Ohio 2012)( "[T]he Sixth Circuit has clarified that a petitioner cannot satisfy the prejudice element by merely telling the court that he would have gone to trial if he had received different advice.  Rather, the test is objective, and Shin must convince this Court that "a decision to reject the plea bargain would have been rational under the circumstances.") (quoting *Pilla,* 668 F.3d at 373) (other citations omitted).

20

a. **Deficient Performance and *Padilla***

The initial question that we must answer within the context of *Hill* and *Strickland* is whether *Padilla* can be applied to the circumstances of the present case. *Padilla* involved the duties of counsel in advising a defendant with respect to a plea offer where counsel misinformed the defendant of the immigration consequences of a drug conviction. *See, Missouri v. Fry*, __U.S.__, 132 S.Ct. 1399, 1406 (2012) (discussing *Padilla*); *Hanna v. Holder*, 740 F.3d 379, 391 (6th Cir. 2014) ("In *Padilla*, the Supreme Court held that an attorney's failure to advise a defendant/client regarding the immigration consequences of a guilty plea constitutes deficient performance where the consequences of the defendant's guilty plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect."). Now, we must determine whether *Padilla* places any Sixth Amendment duty upon an attorney to advise his client prior to the acceptance of a guilty plea of the potential civil consequences such as mandatory exclusion from participation in all federal healthcare programs. Parrino's expert witness, attorney Frank Mascagni, testified at the evidentiary hearing that defense counsel have a duty after *Padilla* to advise their clients, especially licensed professionals, of the potential adverse consequences to their continued professional employment as the result of a guilty plea.[128]

Little case law seems to support Mascagni's view or the judicial expansion of *Padilla* from its unique factual circumstances involving deportation. In fact, the Sixth Circuit observed in *United States v. Nelson*, No. 1:08-CR-068, 2011 WL 883999 at *3 (6th Cir. Jan. 5, 2011) that "[n]either the Supreme Court nor the Sixth Circuit has extended *Padilla* beyond deportation, which is more or less automatic…." *Id.* Consequently, *Nelson* held that the failure of defense

---

[128] DN 78, Tr. 67-78.

counsel to advise the defendant prior to entry of his guilty plea that his conviction would eliminate the possibility of federal benefits did not violate *Padilla,* nor did counsel's related failure to advise his same client of the possibility of enhanced penalties under 21 U.S.C. §851upon future conviction.

In *United States v. Francis*, No. 5:04-CR-74-KSF, 2010 WL 6428639 (E.D. Ky. Dec. 30, 2010), the District Court for the Eastern District of Kentucky similarly rejected an effort to extend *Padilla* by a habeas petitioner who argued that his attorney failed to advise him of the possibility of civil commitment proceedings upon the violation of his supervised release terms as a convicted sex offender. *Francis*, 2010 WL 6428639 at *1-2. As with *Nelson,* the district court in *Francis* declined to apply *Padilla* to nullify the defendant's guilty plea based solely upon the failure of his attorney to advise the defendant of the future possibility of civil commitment proceedings. *Id.* (citing *Brown v. Goodwin*, No. 09-21(RMB), 2010 WL 1930574 at *12-14 (D.N.J. May 11, 2010)). No published decision in the Sixth Circuit has applied *Padilla* in the fashion now urged by Parrino.

Indeed, we are unaware of any published federal decision that has extended *Padilla* outside the context of misadvice concerning deportation. Courts instead have expressly declined to extend *Padilla* to encompass misadvice to, or a failure to advise, a defendant concerning future penalty enhancements or the possibility of civil commitment proceedings. No court to our knowledge has ever held that *Padilla* creates a Sixth Amendment duty for counsel to advise a client prior to the entry of the guilty plea concerning the possibility of ineligibility for participation in federal programs such as Medicare or Medicaid.[129]

---

[129] Only one unpublished federal decision discusses 42 U.S.C. § 1320a-7 in the context of *Padilla*. The decision, *United States v. Pyle*, no. 08-161-CG, 2012 WL 3744723 (S.D. Ala Aug. 28, 2012) involved a South Carolina physician who in 2008 pled guilty in federal court to the charge of misprision of a felony based on the advice of her attorney that her license to practice medicine would not be suspended or revoked. *Id* at *2  While the doctor's

It therefore appears that *Padilla* has yet to be so interpreted in the federal courts.  *See gen., United States v. Suero*, No. 09-CR-41-JL, 2014 WL 6896011 at \*6 n.2 (D.N.H. Dec. 5, 2014) ("'*Padilla* seems not importable - - either entirely or, at the very least, not readily importable - - in the scenarios involving collateral consequences other than deportation.'") (citing *Brown v. Goodwin*, No. 09-211 (D.N.J. May 11, 2010); *Rodriguez-Moreno v. Oregon*, No. 08-493-TC, 2011 WL 6980829 at \*4 (D. Ore.Nov. 15, 2011) ("*Padilla* even if it is applicable, does not expressly require notice of collateral consequences of conviction beyond deportation, i.e., notice is not required for sex offender registration requirements, firearm possession bans, etc.").  In the absence of such authority, the Court has substantial doubt that *Padilla* applies outside the factual context of the deportation scenario.  Until we are advised otherwise by published federal case law, we also are disinclined to expand *Padilla* in the fashion requested by petitioner Parrino.[130]

A contrary holding would not materially advance Parrino's chances of success with his current §2255 motion in any event.  Even were we to conclude in the absence of established

---

counsel did obtain assurances from the South Carolina Medical Board that his client's medical license would not be mandatorily revoked or suspended, he admittedly failed to consider the impact of the mandatory exclusion provisions of 42 U.S.C. § 1320a-7. *Id.* at 2. Subsequently, the OIG in 2012 imposed a mandatory 5-year exclusion on the doctor, similar to what occurred to defendant Parrino.  The doctor subsequently filed a writ of error *coram nobis* seeking to set aside her guilty plea based on a Sixth Amendment claim of ineffective assistance of counsel that relied in part on the retroactive application of *Padilla.*

Just as Parrino now does, the doctor in *Pyle* argued that the same logic in *Padilla* applied to her, where her attorney acknowledged that he failed to advise her of the risk of the 5-year exclusion.  The district court, however, did not reach the merits of the doctor's *Padilla* argument because it determined that *Padilla* created a "new rule" that could not be made retroactive to her 2008 guilty plea.  Consequently, *Pyle* is little help to us in the current case other than to demonstrate that other defendants have attempted the same argument that Parrino now raises.  We also note in passing that the attorney in *Pyle*, unlike attorney Plotnik, acknowledged that he failed to give any consideration to 42 U.S.C. § 1320a-7.  Plotnik in contrast testified at the hearing that he did discuss the statute with Parrino and offered his professional opinion on its possible application.

[130]  While federal case law has yet to so expand *Padilla,* various legal scholars certainly have urged just such an expanded interpretation. *See,* Margaret Love, *Collateral Consequences after* Padilla v. Kentucky:  *From Punishment to Regulation,* 31 St. Louis U. Pub. L. Rev. 87, 105-110 (2011); Paisly Bender, *Exposing the Hidden Penalties of Pleading Guilty:  A Revision of the Collateral Consequences Rule,* 19 Geo. Mason L. Rev. 291, 311-18 (Fall 2011).

precedent that *Padilla* placed a duty on attorney Plotnik to advise Parrino concerning the possibility of mandatory exclusion under 42 U.S.C. §1320a-7, the recent testimony at the suppression hearing convinces the Court that Plotnik satisfied such a duty.

Plotnik testified repeatedly that not only was Parrino aware of the existence of a federal exclusion statute, Plotnik obtained the statute, examined it and discussed it with Parrino prior to the entry of Parrino's guilty plea.  As Plotnik explained, he read the mandatory exclusion provisions of §1320a-7(a) as being primarily directed toward felony offenses, although he conceded that subsection (a)(1) created the possibility of exclusion even for a misdemeanor conviction such as Parrino's.  Plotnik, however, believed that exclusion under this subsection was not a likely possibility in Parrino's case where Parrino was not a member of management at NRS and would be pleading guilty to an offense without an element of intent.[131]

Plotnik testified at the suppression hearing that he directly told Parrino that while it seemed unlikely that a 5-year mandatory exclusion would be imposed upon him should he plead guilty, that possibility nonetheless existed even if it seemed remote to Plotnik, who believed that the permissive subsection of the statute, 42 U.S.C. §1320a-7(b), would more naturally apply to Parrino, and indeed, subsequently was applied by the OIG to Parrino's co-defendant, Linda Schmidt.

---

[131] *See, United States v. Park*, 421 U.S. 658, 672-73 (1975) (criminal liability under the federal Food, Drug & Cosmetic Act does not turn on awareness of some wrongdoing or consciousness of fraud, but rather whether the defendant caused the violation of the Act); *United States v. Dotterweich*, 320 U.S. 277, 281 (1943) (The Act "dispenses with the conventional requirement for criminal conduct - - awareness of some wrongdoing.  In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger" such that if an article is misbranded or adulterated without any conscious fraud the defendant remains liable).  *See also, United States v. Articles of Drug*, 825 F.2d 1238, 1246 (8th Cir. 1986) ("In order to condemn drugs under 21 U.S.C. §331, a district court  must find that (1) the drug is an imitation drug, and (2) the drug moved in interstate commerce.  The Government need not prove knowledge or awareness that the drugs are misbranded or an attempt to deceive or defraud."); *United States v. Guardian-Chemical Corp.*, 410 F.2d 157, 162 (2nd Cir. 1969) (Awareness of wrongdoing need not be proved under 21 U.S.C. §331(a)).

Plotnik's testimony appears to the Court to be the more credible testimony.  Plotnik and Parrino both were focused on the potential collateral consequences that would flow from Parrino's misdemeanor guilty plea.  Parrino asked Plotnik to contact the Kentucky Pharmacy Board.  Plotnik did so and spoke with the director, Mike Burleson, whom Plotnik suspected was misrepresenting the severity of the potential consequences of a misdemeanor conviction.  Plotnik related his communications with the director to Parrino and cautioned Parrino about his concerns about Burleson's candor.

Obviously, the impact of the criminal proceedings on Parrino's professional career was a major concern to both men.  It therefore seems only natural that attorney Plotnik would also consider the federal implications of a possible guilty plea.  The Court strongly believes that attorney Plotnik did so and that he conveyed his professional opinion concerning 42 U.S.C. §1320a-7 to Parrino.  Indeed, it appears to have been part of the strategy to delay, for as long as possible, any potential adverse collateral consequences by extending the criminal proceedings in an effort to "run out the clock" so that Parrino would be near retirement before the possibility of exclusion could come to fruition.

This strategy was at least partially successful as attorney Plotnik was able to delay the guilty plea and the subsequent judgment of conviction for a number of years during which Parrino continued to practice his profession as a pharmacist earning $120,000 a year while employed at K-Mart prior to his ultimate termination from employment in early 2014, some five years after the initial investigation began and almost two and a half years after Parrino pled guilty on Sept. 8, 2011.  Given these circumstances, the far more likely scenario in the Court's view is that attorney Plotnik did discuss the potential for exclusion under §1320a-7 with Parrino prior to the entry of the guilty plea.  Accordingly, the Court so finds as a matter of historic fact

that Plotnik made Parrino aware of the provisions of the statute and its possible application to him based upon the entry of his misdemeanor guilty plea.  Under these facts, no deficient performance occurred even were one to assume that *Padilla* created a duty to advise Parrino of the possibility of exclusion.  Plotnik did so and cannot be found to be constitutionally deficient in the rendition of his legal services as a result.

### b.  The Prejudice Prong

The final matter that the Court considers in its analysis is whether Parrino has satisfied the prejudice prong of *Strickland*.  Only if a reasonable defendant under the circumstances at the time would have insisted upon proceeding to trial but for the misadvice of counsel will the defendant be able to show that the outcome of the proceedings would have been different.  Parrino insists that if he had only known that mandatory exclusion from all federal healthcare programs awaited him following his misdemeanor guilty plea he would *never* have entered into the plea agreement and pled guilty.  His misdemeanor guilty plea in Parrino's view was an economic death sentence that, given his age, permanently ended his professional career as a pharmacist.  Faced with such inevitable, dire economic circumstances, Parrino reasons that risking a felony charge would have been far more preferable in view of the weak nature of the proof of guilt in the Government's possession.

Parrino characterizes this proof as being equivocal at best so that a felony conviction, while not absolutely impossible, would have been a far stretch for the Government, which at best had only (1) Parrino's handwritten statement that he was aware that misbranded respiratory drugs of a subpotent nature had been shipped in commerce by NRS and (2) the ARL lab tests and NRS shipment records.  Accordingly, faced with the choice of a guaranteed $600,000 economic

catastrophe due to mandatory exclusion from his profession following his guilty plea and the competing prospect of proceeding to trial to face a shaky felony charge, Parrino argues that his repeated testimony that he would have insisted on proceeding to trial, represents not only his clear subjective intent, but the choice that any objectively reasonable individual facing the same circumstances would have made.

Once again, we conclude that the testimony of attorney Plotnik is a critical consideration in the resolution of this issue. Plotnik testified that Parrino was deeply concerned over the potential prospect that he would be jointly responsible with NRS for a $2.4 million order of restitution. In fact, as Plotnik explained during the evidentiary hearing, the Government initially attempted to insert into the plea agreement language that would have held Parrino jointly and severably liable for that exact amount. According to Plotnik, Parrino's entire focus was to get the matter over as quickly as possible and to avoid the possibility of trial on felony charges while at the same time using delaying tactics by repeated motions for continuance[132] in an effort to allow Parrino to continue to work as a pharmacist for as long as possible given that he was quickly approaching retirement age. As Plotnik described Parrino's emotional state, Parrino was a "basket case." In Plotnik's opinion, there was no way that Parrino would have gone to trial on a felony charge at that point.

The Court once again concludes that Plotnik's testimony is the more credible. Certainly, now in the calm of hindsight Parrino has asserted that he would have insisted on proceeding to trial. The circumstances as they existed at the time in the Court's view fall far closer to Plotnik's characterization of them than to Parrino's current testimony. The prospect of a potential $2.4 million order of restitution would have chilled the enthusiasm of any defendant and certainly that

---

[132] Beginning on November 21, 2011, attorney Plotnik filed a series of six successful motions to continue Parrino's sentencing over an approximately 15-month period of time (DN 24, 28, 30, 33, 36, 39)

of Parrino, who by the imposition of such a restitution order would have received the same economic death sentence that he now claims that mandatory exclusion pursuant to §1320a-7 imposed on him.  In addition, Parrino would have faced the stress of trial with its concomitant expenses and uncertainties.  The alternative, a misdemeanor guilty plea, would have been far more appealing at the time that events were unfolding, even with the prospect of a potential 5-year exclusion from federal health programs, which the Court has found that Parrino was aware of at the time he elected to plead guilty.

The Court accordingly concludes that Parrino had no intention of proceeding to trial, that he had been directly advised of the possibility of exclusion under 42 U.S.C. §1320a-7, and that his plan was to minimize the amount of restitution as much as possible while delaying the proceedings to afford himself the maximum opportunity to work as a pharmacist before any potential adverse consequences could be imposed upon him.  The strategy was reasonable, logical and worked quite well so that an objectively reasonable person under the circumstances would have in the Court's view chosen to pursue it.  On the other hand, such an objectively reasonable individual would not have risked the possibility of a $2.4 million dollar order of restitution, a criminal conviction and at the end of the proceedings the same mandatory exclusion under §1320a-7.  The Court therefore is compelled to conclude that Parrino has not satisfied either prong of *Strickland*, the deficient performance or the resulting prejudice prong.  For this reason the Court shall deny his §2255 petition.  The only question remaining is whether Parrino is entitled to a certificate of appealability pursuant to 28 U.S.C. §2253(c)(1)(B).

**Certificate of Appealability.**

The final question as noted is whether Parrino is entitled to a certificate of appealability (COA) pursuant to 28 U.S.C. § 2253(c).  A state or federal prisoner who seeks to take an appeal from the dismissal of a habeas corpus petition or a motion to vacate must satisfy the COA requirements of 28 U.S.C. § 2253(c).  A COA will be issued only if the applicant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).

Such a substantial showing is made when a prisoner establishes that jurists of reason would find it debatable whether the petition or motion states a valid claim of the denial of a constitutional right or, in the cases in which the petition is resolved based upon a procedural ruling, that jurists could find it debatable whether the district court was correct in its procedural ruling.  *See Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001).  The Court is required to make an individual assessment of the issues and to indicate which specific issue or issues satisfy the standard of § 2253(c).  *See Stanford v. Parker*, 266 F.3d 442, 450-51 (6th Cir. 2001), *cert. denied*, 537 U.S. 831 (2002).  *See also Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (discussing 28 U.S.C. § 2253(c)).  A state prisoner may raise on appeal only those specific issues for which the district court grants a certificate of appealability.  *Powell v. Collins*, 332 F.3d 376, 398 (6th Cir. 2003).

Parrino has satisfied the above standard.  While the Court has not accepted Parrino's position on the alleged Sixth Amendment violation of his right to effective assistance of counsel based on *Padilla*, the Court nonetheless recognizes that reasonable jurists could debate the proposition and that a substantial constitutional issue has been raised for such debate.  Parrino consequently has satisfied the statutory requirements under 28 U.S.C. §2253(c) for issuance of a certificate of appealability.

## CONCLUSION

The Magistrate Judge having made findings of fact and conclusions of law, **DENIES** the motion to vacate, set aside or correct filed by Parrino.  He is **GRANTED** a certificate of appealability on his Sixth Amendment claim of ineffective assistance of counsel.

This is a final and appealable order.

Copies to Counsel of Record